MONTGOMERY CHARTER SERVICE, INC., Petitioner,

v.

The WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent.

No. 17307.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 15, 1963.

Decided Nov. 25, 1963.

---

1. The patent allegedly infringed is No. 2,585,530, issued to Norman Bennett on February 12, 1952.

Mr. Robert J. Stanford, Washington, D. C., with whom Mr. William F. Reed, Washington, D. C., was on the brief, for petitioner.

Mr. Russell W. Cunningham, Gen. Counsel, Washington Metropolitan Area Transit Commission, for respondent.

Before WILBUR K. MILLER, BASTIAN and BURGER, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

On May 18, 1962, the Washington Metropolitan Area Transit Commission [1] initiated a proceeding to ascertain whether the operations of Montgomery Charter Service, Inc., were in violation of Section 4(a) of Article XII of Title II of the Compact (74 Stat. 1037) which provides that

"No person shall engage in transportation *subject to this Act* unless there is in force a certificate of pub-

1. This Commission was created by the Washington Metropolitan Area Transit Regulation Compact entered into by the State of Maryland and the Commonwealth of Virginia and consented to by Congress, which also authorized and directed the Board of Commissioners of the District of Columbia to enter into and execute it on behalf of the United States for the District of Columbia. 74 Stat. 1031.

lic convenience and necessity issued by the Commission authorizing such person to engage in such transportation * * *." (Emphasis added.)

An evidentiary hearing was conducted June 5, 1962, at which it appeared, without contradiction, that Montgomery Charter was operating airport limousines (vehicles having a seating capacity of eight passengers or less in addition to the driver) on regular schedules between fixed points in Montgomery County, Maryland, and the Washington National Airport in Virginia, and that it had not obtained a certificate of public convenience and necessity from the Commission authorizing such transportation.

Concluding that this conduct constituted a violation of Section 4(a), the Commission on July 20, 1962, ordered Montgomery Charter to "cease and desist from transporting persons for hire, on a scheduled basis, between its terminal in Montgomery County, Maryland, or other fixed location, and the Washington National Airport." [2]

Montgomery Charter petitions for review, asserting that by the terms of the Compact its operation of airport limousines is exempt from regulation by the Commission except with respect to rates and minimum insurance coverage, and that consequently a certificate of public convenience and necessity is not required.

Section 1(a), Article XII, Title II of the Compact,[3] thus describes the transportation covered:

"This Act shall apply to the transportation for hire by any carrier of persons between any points in the Metropolitan District and to the persons engaged in rendering or performing such transportation service except * * *"

five enumerated forms of transportation, none of which is relevant here. As Montgomery Charter transports persons for hire between points in the Metropolitan District, it would clearly be covered by the Act except for Section 1(c), which at the time of entry of the order read as follows:

"Notwithstanding the provisions of paragraph (a) of this section, this Act shall apply to taxicabs and other vehicles having a seating capacity of eight passengers or less in addition to the driver thereof with respect only to (i) the rates or charges for transportation from one signatory to another within the confines of the Metropolitan District, and (ii) requirements for minimum insurance coverage."

■ As we have said, the evidence shows that Montgomery Charter's limousines have a seating capacity of no more than eight passengers in addition to the driver. It follows that Section 1(c) in clear and unambiguous language declares that, notwithstanding Section 1(a), the Act shall not apply to Montgomery Charter's limousines except as to rates and insurance coverage: that is, that Montgomery Charter is not required to obtain a certificate of convenience and necessity before engaging in such transportation. Construction of Section 1(c) according to its terms does not lead to absurd, impractical or unreasonable consequences.

■ The Commission's brief flatly states, nevertheless, that "The language of Section 1(c) is ambiguous" and seeks to demonstrate from the legislative history of the Act that Congress did not intend Section 1(c) to mean what it plainly, unambiguously and unequivocally says. The Commission's statement

---

**2.** A similar order entered December 14, 1961, was set aside by us because there was no evidence in the record to support a finding—and indeed the Commission had not found—that Montgomery Charter had actually engaged in the operations it was commanded to discontinue. Thus we did not reach the ques-

tion concerning the coverage of the Compact which is now before us. Montgomery Charter Service, Inc. v. Washington Met. Area Transit Comm., 112 U.S. App.D.C. 321, 302 F.2d 906 (1962).

**3.** 74 Stat. 1035.

that Section 1(c) is ambiguous is obviously inaccurate, as the plain terms of the section show. An inaccurate allegation of ambiguity does not justify the use of legislative history to vary the meaning of clear and unambiguous statutory language. We said in Elm City Broadcasting Corp. v. United States:[4]

"* * * It is elementary in the law of statutory construction that, absent ambiguity or an absurd or unreasonable result, the literal language of a statute controls and resort to legislative history is not only unnecessary but improper. United States v. Missouri Pac. R. Co., 1929, 278 U.S. 269, 49 S.Ct. 133, 73 L.Ed. 322.[*]

"[*] In that case the Supreme Court said, 278 U.S. at page 278, 49 S.Ct. at page 136:

"'* * * Where doubts exist and construction is permissible, reports of the committees of Congress and statements by those in charge of the measure and other like extraneous matter may be taken into consideration to aid in the ascertainment of the true legislative intent. But where the language of an enactment is clear and construction according to its terms does not lead to absurd or impractical consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed. [Cases cited.]'"

The Commission argues that the meaning of Section 1(c) was changed by the following paragraph in Section 2, which contains definitions of certain statutory terms:

"(d) The term 'taxicab' means any motor vehicle for hire (other than a vehicle operated, with the approval of the Commission, between fixed termini on regular schedules) designed to carry eight persons or less, not including the driver, used for the purpose of accepting or soliciting passengers for hire in transportation subject to this Act, along the public streets and highways, as the passengers may direct."

The contention is that exemption from regulation (except as to rates and insurance coverage) which Section 1(c) extends to "other vehicles having a seating capacity of eight passengers or less" was nullified or withdrawn by this statutory definition of the word "taxicab." The Commission thus summarizes its argument:

"The operation of any motor vehicle, regardless of size, operated between fixed termini on schedule must have the approval (i. e., a certificate of public convenience and necessity) of the Commission."

The argument is based on two assumptions:

1. That "the approval of the Commission" referred to in Section 2(d) can be given only by the issuance of a certificate of public convenience and necessity provided for by Section 4(a); that is, that "approval" means certification.

2. That the parenthesized words in the statutory definition of the word "taxicab," so construed, emasculate a clear provision of Section 1(c) which exempts these airport limousines from full regulation.

If either assumption is incorrect, the argument fails.

We now examine the first assumption. As we have said, Section 1(c) clearly provides that before motor vehicles having a seating capacity of eight passengers or less may be operated on regular schedules between fixed termini in the Metropolitan District, the Commission must approve the rates and minimum insurance coverage. We think it clear that the Commission's approval of rates and insurance coverage referred to in Section 1(c) is exactly the same "approval of the Commission" referred to in the definition of a "taxicab" in Section 2(d). Certainly that simple approval does not require the issuance of a certificate of

4. 98 U.S.App.D.C. 314, 319, 235 F.2d 811, 816 (1956).

public convenience and necessity with the full panoply of regulation imposed by Section 4 et seq. upon certificated carriers operating vehicles with large seating capacity in the mass transportation of passengers. That regulation goes far beyond the mere approval of rates and insurance coverage.

For example, among the many provisions of Section 4 et seq. with respect to certificated carriers are these: the Commission may withhold a certificate unless it finds that the proposed transportation is or will be required by the public convenience and necessity; no carrier may abandon a route specified in its certificate without being authorized to do so; the Commission may prescribe the form of the carrier's accounts, records and reports, and may control the issuance of its securities, and supervise consolidations, mergers and acquisitions of control. By providing that the Act shall not apply to vehicles having a seating capacity of eight passengers or less except as to rates and insurance coverage, Section 1(c) expressly exempts such vehicles from the other phases of regulation imposed upon vehicles with large seating capacity by which mass transportation is accomplished.

■ Our construction of the word "approval" in Section 2(d), which seems to us to be clearly correct, prevents the repugnance between that section and Section 1(c) which would arise under the Commission's theory that "approval" is given only by the issuance of a certificate. By giving the word "approval" in Section 2(d) what we regard as its true meaning, the sections are harmonized and full effect is given to each. We said in Fisher v. District of Columbia:[5]

"  *  *  *  In construing a statute it is, of course, necessary to give effect to all its provisions, if possible;

different portions of a statute will not be held to be repugnant to each other if they can be reconciled. *  *  *  "

Under this principle of statutory construction, we are not to suppose that in Section 1(c) Congress exempted eight-passenger vehicles from certification and in the next section ordered that they be certificated, unless the language of the sections undoubtedly requires that incongruity. As we have seen, the language of the two sections does not require it; the two sections are easily reconciled.

■ We hold, therefore, that the words "approval of the Commission" in Section 2(d) refer only to approval of rates and insurance coverage; that "approval" is not synonymous with "certificate of public convenience and necessity" as the Commission assumes. Thus, as the Commission's first assumption is incorrect, its argument fails, and we need not pass on the validity of its second assumption that a parenthetical expression in the statutory definition of "taxicab" destroys the exemption from full regulation granted by Section 1(c) to airport limousines which are not taxicabs under that definition. Montgomery Charter is entitled to the partial exemption from regulation provided by Section 1(c). It follows that the cease and desist order under review was based on the Commission's erroneous interpretation of Sections 1(c) and 2(d); therefore, the order will be set aside.

There is an interesting sequel to the story of this case which must be noticed. While the first case between these parties[6] was pending in this court, the Commission sought legislation to amend Section 1(c) so as to eliminate the partial exemption from regulation granted therein to vehicles other than taxicabs which

---

5. 82 U.S.App.D.C. 371, 372, 164 F.2d 707, 708 (1947). See also Korte v. United States, 260 F.2d 633, 636 (1958), cert. denied 358 U.S. 928, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959), where the Ninth Circuit said:

"In cases of seeming conflict in the provisions of a statute, the construction which would permit both provisions to stand should be employed  *  *  *  ."

6. Our No. 16,798, referred to in footnote 2, was decided April 27, 1962.

have a seating capacity of eight passengers or less. Such legislation having been enacted by the legislatures of Maryland and Virginia, a joint resolution to give consent and approval to it was introduced in Congress on April 12, 1962. The resolution was adopted October 9, 1962 (76 Stat. 764) and includes the following amended version of Section 1 (c):

"(c) Notwithstanding the provisions of paragraph (a) of this section, this Act shall apply to taxicabs and other vehicles used in performing a bona fide taxicab service having a seating capacity of eight passengers or less in addition to the driver thereof with respect only to (i) the rate or charges for transportation from one signatory to another within the confines of the Metropolitan District, and (ii) requirements for minimum insurance coverage."

Thus this new legislation amends Section 1(c) to read as the Commission erroneously contends the original Section 1(c) should have been read.

The new Section 1(c) does not give rise to mootness here, however, and the Commission does not so contend. At the hearing on the joint resolution conducted by the House Committee on the Judiciary, Montgomery Charter suggested an amendment to create "grandfather" rights for a carrier which had lawfully operated under the original Section 1(c). In order to avoid this amendment which would be a substantive change in the legislation adopted by Maryland and Virginia, the Commission's Executive Director sent the following letter to Montgomery Charter:

"The interest of any person affected by a Court's subsequent decision, finding that the proposed amendment to 1(c) is a substantive change, would be protected as a matter of law, and as such entitled automatically to a grandfather certificate authorizing such operations as that person was bona fide and legally engaged in on the effective date of the House Joint Resolution.

"In short, if your interpretation of the present language of Section 1(c) is sustained by a Court of competent jurisdiction, it is the intent of this Commission to issue to your client without further proceedings or hearings, appropriate authority covering theretofore exempt operations. Such action by the Commission would be in accordance with a reasonable interpretation of Section 4(a) of Article 12 of the Compact."

A copy of this letter was sent to the House Committee and the Committee expressed agreement with the views set forth therein and thereafter incorporated it into its report. (H. R. Rep. No. 1979, 87th Cong., 2d Sess.)

■ The joint resolution of October 9, 1962, made a substantive change in the original Section 1(c) of the Compact by eliminating the partial exemption from regulation of limousine operations such as that conducted by Montgomery Charter. Consequently Montgomery Charter is now entitled to receive and the Commission shall, without further proceedings, issue a "grandfather" certificate pursuant to Article XII, Section 4(a), authorizing such operation of an airport limousine service as petitioner was legally and in good faith engaged in prior to the entry of the cease and desist order and prior to the amendment of Section 1(c) of the Compact.

It is so ordered.